FREDERICKA HOMBERG WICKER, Judge.
|2In this domestic matter, appellant seeks review of the trial court’s judgment granting appellee’s petition to nullify an October 1, 2009 consent judgment pursuant to La. C.C.P. art. 2004. At the trial court level, appellee asserted that opposing counsel’s failure to disclose her representation of the presiding trial judge’s brother in an unrelated domestic proceeding as well as the trial judge’s failure to recuse herself for the same reason constitutes fraud or ill practice sufficient to annul the consent judgment entered into between the parties. For the following reasons, we find the trial court erred in nullifying the consent judgment and we reverse the trial court judgment.

FACTS AND PROCEDURAL HISTORY

W.T. and E.A. married on October 21, 1994. Of that marriage, two children were born.[1] On June 2, 2003, the parties divorced and entered into a consent judgment that granted the parties joint custody of the two children. On August 22, 1 s2008, the children’s mother, E.A., filed a Rule to Modify Custody and to Set Child Support, seeking to be designated the domiciliary parent and also seeking child support. The trial court, the Honorable Martha Sassone presiding, appointed Dr. Steven York[2] to perform a complete custody evaluation. On December 4, 2008, following a hearing officer conference on E.A.’s Rule to Modify Custody and Set Child Support, the hearing officer recommended that E.A. be designated the domiciliary parent; that W.T. be granted unsupervised visitation of the children every other weekend; and that W.T. be ordered to pay E.A. $2,087.50 per month in child support.[3] Judge Sassone signed the judgment accepting the hearing officer’s recommendations, designating E.A. as domiciliary parent and awarding $2,087.50 in monthly child support. On January 16, 2009, W.T. filed an “emergency motion” seeking sole custody and child support.[4] *342 On January 28, 2009, the hearing officer continued W.T.’s rule to change custody because Dr. York had not yet completed his evaluation.[5] The hearing officer further recommended that W.T. be found in contempt for failing to pay child support as ordered by the court on December 4, 2008. Sentencing was deferred to the district judge.[6] W.T. filed a timely objection to the hearing officer’s recommendations and a hearing was set for February 20, |42009, before the newly elected judge in Division K, the Honorable Ellen Shirer Kovach.
On February 20, 2009, Judge Kovach held W.T. in contempt for failure to pay child support in accordance with the court’s order. On that same date, however, Judge Kovach gave W.T. additional time to pay his child support and ordered him to pay the full arrears of child support within one week or “there will be penalties assessed under Louisiana Revised Statute 13:4611.”[7] Judge Kovach ordered W.T. to appear for a hearing on March 9, 2009, to show his compliance with the court’s order.[8] On that date, W.T. did not appear. W.T.’s counsel appeared and indicated that she could not reach her client and did not provide any excuse for his absence.[9] The trial judge issued an attachment and the sheriffs office contacted W.T., instructing him to appear in court the next morning. The following day, March 10, 2009, the trial judge found that W.T. did not pay the outstanding child support payment on the given purge date of February 27, 2009, and did not appear to court on March 9, 2009, as ordered by the court, to prove that he was in compliance with the ordered child support payments. While W.T. eventually made full payment later in the day on March 10, 2010, he did so only after Judge Kovach warned his counsel that he faced up to ninety days in prison.[10] Judge Ko-vach found that W.T. had shown “a total and utter disregard for the orders of this Court.” She sentenced W.T., pursuant to La. R.S. 13:4611 as | ¡¡previously instructed, *343 to five days with the Jefferson Parish Correctional Center and a $500.00 fine. W.T. filed a writ application with this Court, which was denied.
After Judge Kovach sentenced W.T. to five days imprisonment for his contempt, W.T. filed a motion to recuse the trial judge. On June 5, 2009, after a full hearing, the Honorable Nancy Miller of the 24th Judicial District Court found that W.T. failed to prove that Judge Kovach showed any actual bias or prejudice against him and denied his motion to re-cuse.
On August 26, 2009, E.A. filed an expedited rule for sole custody, alleging that W.T. emotionally abused the children; that he abused alcohol in the children’s presence; and that Dr. York’s evaluation recommended that W.T.’s visitation be limited. The trial court conducted a hearing on various pending motions on September 4, 2009.[11] On that date, the court-appointed custody evaluator, Dr. York, testified. Dr. York testified that neither of the children desired to see or have any relationship with their father, W.T. He testified that the parties’ daughter was afraid to sleep at her, father’s house and that she was embarrassed to have any friends sleep over because she worried that her father would drink too much and became too angry in front of her friends. Dr. York testified that the parties’ son reported that his father made him kneel on rice with his hands stretched out as punishment.[12] The son further reported that his father accused him of using , drugs and that he has run away from school to avoid being picked up by his father. Dr. York testified that E.A. had stayed overnight in a hotel with the children for fear of W.T.’s actions.
liiDr. York also testified that his initial report contained a note of caution indicating that, especially in this case, it was imperative that neither parent discuss the findings of his report with the children. Dr. York, in his report, recommended that “[a]ny action taken against the children, due to what they have said to me [Dr. York], should be treated harshly.” Dr. York then testified that, after he provided his report to the parties, W.T. did in fact discuss the custody evaluation with the children, telling the children that their lies may cause him to go to jail and to “have a good life.” Before Dr. York’s testimony was completed, counsel for both parties requested a recess.
During the recess, the parties negotiated the Consent Judgment at issue in this case and read same into the record. The consent judgment (1) awarded joint custody to the parties, naming E.A. as the primary domiciliary parent; (2) named Dr. Stephen Thompson as the family therapist to facilitate and approve visitation between W.T. and the children; (3) ordered that E.A. and the children meet with Dr. Thompson prior to W.T.; (4) provided that if W.T. had an emotional outburst, as determined by Dr. Thompson, he would have supervised visitation until Dr. Thompson determined it is no longer necessary; (5) permitted the children to interact with E.C.’s son[13]; (6) ordered W.T. to engage in individual therapy with a counselor of his choice; (7) ordered that E.A. remain in *344 individual therapy; (8) ordered that the minor children remain in psychotherapy; (9) provided that both parents and E.A.’s second husband, J.P., submit to drug and alcohol assessments; (10) provided that W.T.’s rule to reduce child support would be dismissed[14]; (11) provided that E.A.’s rule for contempt against W.T. for failure to pay child support would be dismissed; (12) provided that W.T. would pay $8,571.25 in child support ^arrearages in the amount of $1,000.00 per month until paid in full; (13) provided that W.T. would pay child support payments in the amount of $1,043.25 on the 1st and the 15th of each month for the two minor children; and (14) provided that neither parent will discuss proceedings with the children nor “denigrate the other parent ... to the minor children.” The judgment was read into the record on September 4, 2009. The parties, W.T. and E.A., were sworn in by the Court and testified that they understood and agreed to the terms of the consent judgment. The parties’ counsel each signed the judgment and submitted same to the trial court. The consent judgment was signed by Domestic Commissioner Ruben Bailey on October 1, 2009.
On October 1, 2009, the same date that the consent judgment at issue was signed, W.T. filed a motion seeking to have E.A. held in contempt for violation of the consent judgment by failing to timely bring the children to Dr. Thompson for evaluation. On November 12, 2009, the hearing officer recommended that E.A. be found in contempt for delaying the children’s visit with Dr. Thompson. The hearing officer further imposed sanctions against E.A. for her failure to appear at the hearing officer conference. E.A. subsequently filed an objection to the hearing officer’s recommendations. On December 16, 2009, the trial court conducted a hearing. E.A. testified at the hearing that she did not immediately bring the children to Dr. Thompson after the September 4, 2009 hearing because she wanted to wait until the consent judgment was signed by the parties and the court to ensure that W.T. would comply with the judgment. E.A. testified further that she waited until the consent judgment was signed so that she could provide a copy of the judgment to Dr. Thompson. E.A. pointed out that the consent judgment did not provide a date upon which she needed to contact Dr. Thompson and she thought it was reasonable to wait until the judgment was signed by the parties and the court.
18Pr. Thompson also testified at the contempt hearing. He testified that he met with E.A. and the children on October 14, 2009. He also testified that, although he does not always receive a judgment prior to beginning therapy in custody cases, he does prefer to have a judgment prior to commencing therapy to clarify his role in the entire process. At the conclusion of the hearing, Judge Kovach found that E.A. acted reasonably in scheduling the children’s meeting with Dr. Thompson and found that she was not in contempt.[15] Re *345 garding the imposition of sanctions against E.A., Judge Kovach vacated that portion of the hearing officer’s recommendations, finding E.A.’s actions in bringing the children to Dr. Thompson within fourteen days of the signing of the judgment were reasonable and further that the underlying rule for contempt, filed on the same date that the consent judgment was signed, had “no merit whatsoever.”
After the ruling finding E.A. not in contempt of the consent judgment, W.T. filed a second motion to recuse Judge Kovach. At the recusal hearing, before the Honorable Henry Sullivan of the 24th Judicial District Court, Judge Kovach testified that she vacated the imposition of sanctions for E.A.’s and her counsel’s failure to appear at the hearing officer conference because E.A.’s counsel had articulated to the court that W.T. threatened her following the previous hearing officer conference and that E.A.’s counsel did not feel comfortable attending subsequent hearing officer'conferences without co-counsel present for her safety. Judge Kovach testified that she determined that although she found counsel’s behavior to be unprofessional, sanctions were not appropriate at that time given the totality of the circumstances in this case; however, Judge Kovach cautioned |ncounsel regarding the importance of attending hearing officer conferences in the future. Following the hearing, Judge Sullivan found no grounds for recusal and denied W.T.’s motion to recuse Judge Ko-vach.
On July 8, 2011, Judge Kovach voluntarily recused herself and ordered that the matter be transferred to another division of the 24th Judicial District Court. In the order of recusal, Judge Kovach stated:
[I]t has come to the attention of the court that counsel enrolled in this matter has recently represented a family member in a domestic matter. A review of La. C.C.P. arts. 151 and 152 reveals no grounds for recusal in this instance. Although the court believes that it can continue to be fair and impartial, in order to avoid a situation wherein the Court’s impartiality might reasonably be questioned, and pursuant to Cannon 3 of the Code of Judicial Conduct, I ... voluntarily recuse myself from presiding over the above[-]captioned matter.[16]
Eight months later, on March 5, 2012, W.T. filed a Petition to Annul Consent Judgment. W.T. asserted that, since the date of the September 4, 2009 consent judgment, he learned that opposing counsel, Bernadette Lee, represented Judge Kovach’s brother at the same time she presided over W.T.’s domestic matter. W.T. alleged that Judge Kovach was prejudiced and that he would not have entered into the consent judgment had he known of opposing counsel’s relationship with the judge’s brother. W.T. asserted that he entered into the September 4, 2009 consent judgment upon advice of counsel based upon his counsel’s experience thus far with Judge Kovach in Division K. He alleged that favoritism was granted upon counsel for E.A. throughout the proceedings and that Judge Kovach voluntarily recused herself, on her own motion, as soon as the relationship between opposing counsel and Judge Kovach’s brother was made public. He further alleged that he was prevented from introducing evidence to support his claim because of the conflict of interest between the judge and [ tnopposing counsel, and sought annulment of the September 4, 2009 consent judg *346 ment asserting that it was obtained by ill practices.
On August 15, 2012, E.A. filed exceptions of no cause of action and prescription to the Petition to Annul Consent Judgment. On September 14, .2012, the Honorable Donald Rowan overruled EA.’s exceptions. E.A. filed a writ application to this Court seeking review of the September 14, 2012 judgment overruling her exception of no cause of action. This Court exercised its supervisory jurisdiction and determined that the trial court did not err in overruling the exception of no cause of action.[17]
The trial court conducted the nullity hearing on June 20, 2013, and July 11, 2013. Judge Kovach was not called by any party to testify at the nullity hearing. Judge Kovach’s brother, William Shirer, testified that Bernadette Lee, E.A.’s counsel, represented him in a divorce proceeding in 2005 and testified that Judge Kovach knew that Bernadette Lee represented him in 2005. He also testified that Bernadette Lee prepared correspondence related to Mr. Shirer’s child custody matter pending in a Colorado court from 2008-2010, and that, in the summer of 2010, she represented Mr. Shirer on appeal in the Colorado matter.[18] Mr. Shirer did not pay Ms. Lee for any correspondence or work performed in the Colorado court. |n However, no testimony was presented to show that, prior to her voluntary recusal, Judge Kovach knew that Ms. Lee represented or provided advice to Mr. Shirer after 2005 or during the instant proceedings.[19] Bernadette Lee testified and acknowledged that she never disclosed the fact that she had represented the judge’s brother to the judge or opposing counsel during any hearings, including the recusal hearings. Further, Bernadette Lee testified that, sixteen years prior, she represented another *347 member of Judge Kovach’s family. Ms. Lee testified that Judge Kovach conducted a telephone conference with both counsel, immediately prior to recusing herself, and indicated that she recently learned that Ms. Lee, at that time, represented her brother in a pending domestic matter in the 24th Judicial District Court. Following the telephone conference, in which W.T.’s counsel indicated his belief that his client would prefer for Judge Kovach to recuse herself, Judge Kovach issued her Order of Recusal.
W.T. testified at the nullity hearing. In support of his contention that Judge Ko-vach was biased against him, he testified that Judge Kovach ordered him to pay thousands of dollars in child support, held him in contempt for failure to pay his child support, handcuffed him in the courtroom for several hours, and ordered him to serve flat time in solitary confinement after he paid full restitution of what he owed. W.T. testified that he was unaware that opposing counsel represented the judge’s brother in his domestic matter or that she corresponded with a Colorado court in 2008-2010 on behalf of the judge’s brother. W.T. testified that he would not have signed the consent judgment had he known of the relationship between the judge’s brother and opposing counsel.[20]
|12W.T. learned of the relationship between opposing counsel and the judge’s brother after he filed a complaint with the Office of Disciplinary Counsel (ODC) against Ms. Lee. Thereafter, W.T. learned that the ODC formally charged Ms. Lee and that some of the charges related to her actions in a Colorado court on behalf of Mr. Shirer, Judge Kovach’s brother.[21] He testified that he “put two and two together” and, a few days after the formal charges against Ms. Lee were made public, Judge Kovach recused herself.
At the nullity hearing, W.T. testified that he really doesn’t “recall what the Judge did.” When questioned about whether the consent judgment was inequitable, W.T. testified that the judgment was unfair because it should have never been signed. His attorney argued, in closing argument, that the consent judgment is unfavorable to W.T; because it placed Dr. Thompson, who is not a medical doctor, in control of when W.T. can have access or visitation with his children.[22]
Ms. Sherry Sandler, W.T.’s former counsel, also testified at the nullity hearing. Ms. Sandler testified that, had she known of the relationship between the judge’s brother and opposing counsel, she would have moved to recuse Judge Kovach immediately.
Ms. Sandler testified that, on March 10, 2009, the date on which W.T. was held in contempt and sentenced to flat time, W.T. , appeared in court without payment. She further testified that, after Judge Kovach expressed to her that W.T. faced 90 days imprisonment for his contempt charge, W.T. borrowed the money from his father within an hour or two. Ms. Sandler acknowledged that five days |13flat time to *348 which Judge Kovach sentenced W.T. was “within her discretion” but stated that the judge “went too far” and disregarded the fact that the other party was not following court orders. She testified to her opinion that Judge Kovach was "biased against her client, W.T. Ms. Sandler testified that, in her nine years of practice, she has never seen a judge impose flat time on a litigant after they have made a payment of child support in full. Ms. Sandler testified that it was “amazing” that opposing counsel did not disclose during two recusal hearings that she represented the judge’s brother or that she had represented the judge’s brother in a matter in Colorado “for free.”[23]
Bernadette Lee was the only attorney who testified at the nullity hearing who was present for the September 4, 2009 hearing and involved in the negotiations resulting in the consent judgment at issue. Ms. Lee testified that Dr. York’s testimony began in the morning and that, during a lunch break, the parties’ counsel discussed a potential settlement. Ms. Lee testified that her client, E.A., simply wanted peace and wanted the litigation to stop. She approached Mr. Garrity, W.T.’s counsel, who was very receptive to discuss settlement. She testified that, after speaking with his client, Mr. Garrity returned and told Ms. Lee that W.T. was reluctant to enter into a settlement and that he could not convince his client to* enter into a settlement at that time — even though Mr. Garrity indicated he advised W.T. it would be best to do so. Ms. Lee testified that the parties returned after lunch and that Mr. Garrity requested for the parties to speak with the judge in her chambers. Ms. Lee stated that Mr. Garrity essentially threw his client “under the bus” and, after the conference in chambers, a settlement was reached. Ms. Lee [Mtestified that Judge Kovach was mostly silent during the conference, allowing the attorneys to negotiate and reach a settlement.
On July 17, 2013, Judge Rowan signed a judgment granting W.T.’s Petition to Annul Consent Judgment. E.A. has appealed the trial court judgment, asserting that W.T. failed to meet his burden under La. C.C.P. art. 2004 to nullify the consent judgment entered into between the parties. We agree. For the following reasons, we find the trial court improperly granted W.T.’s petition to nullify and we reverse the trial court’s judgment.

DISCUSSION

La. C.C.P. art. 2004 provides that “[a] final judgment obtained by fraud or ill practices may be annulled.” Fraud and ill practices does not require intentional fraud or wrongdoing but rather is sufficiently broad to encompass “all situations wherein a judgment is rendered through some improper practice or procedure.... ” Kem Search, Inc. v. Sheffield, 434 So.2d 1067, 1070 (La.1983). When reviewing a trial court decision on a petition to nullify pursuant to La. C.C.P. art. 2004, the “issue for the reviewing court is not whether the trial court was right or wrong but whether the trial court’s conclusions were reasonable.” Belle Pass Terminal, Inc. v. Jolin, Inc., 01-0149 (La.10/16/01), 800 So.2d 762, 767.
A party seeking to annul a judgment under La. C.C.P. art. 2004 “must show both that the challenged judgment resulted from a deprivation of a legal right and that its enforcement would be ‘unconscionable and inequitable.’” Guidry v. *349 First Nat. Bank of Commerce, 98-2383 (La.App. 4 Cir. 3/1/00), 755 So.2d 1033, 1036, writ denied, 00-0920 (La.5/26/00), 762 So.2d 1106, citing Kem Search, Inc. v. Sheffield, 434 So.2d 1067, 1070 (La.1983).
On appeal, E.A. seeks review of the trial court’s judgment granting W.T.’s petition to nullify the September 4, 2009 consent judgment at issue. E.A. argues |1Bthat there is no evidence that the consent judgment at issue was entered into through any fraud or ill practice. Further, E.A. asserts that W.T. failed to prove that he was deprived of any legal right or that enforcement of the consent judgment at issue, which E.A. contends is in W.T.’s favor, would be unconscionable or inequitable.
In response, W.T. argues that Judge Kovach should have recused herself prior to the September 4, 2009 consent judgment at issue. W.T. asserts that Judge Kovach was clearly biased against him and that she treated the parties unequally. In support of his assertions, W.T. points to the fact that Judge Kovach sentenced him to five days imprisonment when he failed to appear for a hearing but points out that E.A. was not held in contempt for her failure to appear at two different hearing officer conferences.[24]
The record reflects that W.T. was held in contempt for failure to pay his child support as ordered by the court. Subsequently, W.T. failed to appear in front of Judge Kovach on March 9, 2009, as she specifically ordered, and only made payment of child support after Judge Kovach instructed W.T.’s counsel that he faced ninety days imprisonment. Regarding the hearing officer conferences for which E.A. did not appear, the record reflects reasonable excuses for her absences that Judge Kovach determined did not warrant sanctions or imprisonment.
|1ñThe first hearing officer conference, on November 12, 2009, set W.T.’s motion for contempt against E A. for her failure to bring the children to Dr. Thompson as provided in the consent judgment. The record reflects that the motion for contempt against E.A. for violation of the consent judgment was filed on the same date that the consent judgment was signed by Commissioner Bailey. Judge Kovach testified at the recusal hearing that she found E.A.’s actions in meeting with Dr. Thompson within two weeks of the signing of the consent judgment to be reasonable *350 and did not hold E.A. in contempt. Judge Kovach further explained that she vacated the hearing officer’s recommended sanctions against E.A. for her counsel’s failure to appear at the hearing officer conference because her counsel, Bernadette Lee, previously articulated to the court that W.T. threatened her at the most recent hearing officer conference. The record reflects that Ms. Lee reported the incident to Gretna police and Ms. Lee testified that she did not feel comfortable or safe attending another hearing officer conference without co-counsel present. Ms. Lee testified that she was unable to find co-counsel to attend the November 12, 2009 hearing officer conference and that she informed the hearing officer ahead of time that she would not be present that day.
Regarding the second hearing officer conference set for December 22, 2009, on E.A.’s rule for contempt against W.T., E.A. presented to the court a medical note wherein her doctor advised that she could not attend court due to the effect to her high-risk pregnancy.[25] W.T. argues that E.A. was not placed on bed rest at that time and points to surveillance video[26] he obtained of E.A. performing other tasks, such as gardening, and contends that E.A. was untruthful to the court. First, the medical note that E.A. provided to the trial court does not state that E.A. was | ^placed on bed rest. Rather, the note simply indicates that E.A. may not attend any further court hearings during her pregnancy. E.A. testified that her doctor used a device during her pregnancy to measure and document her contractions and discovered that, during court hearings, E.A.’s contractions were more frequent. Therefore, E.A.’s doctor, advised that she not attend any further court hearings through the remainder of her high-risk pregnancy. We find this is a sufficient and reasonable excuse for E.A.’s absence during the second hearing officer conference and that Judge Kovach was reasonable in her finding.
La. C.C.P. art. 151[27] provides the grounds upon which a judge shall be *351 recused from a matter. It is well-established in our law that the statutory grounds for recusal in Article 151 are exclusive. Guidry, 755 So.2d at 1037. A trial judge may be recused when she is “biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties’ attorneys to such an extent that [s]he would be unable to conduct fair and impartial proceedings.” La. C.C.P. art. 151 B(5). However, a judge is presumed to be impartial. The party seeking to recuse cannot merely allege lack of impartiality; he must present some factual basis. Further, the bias, prejudice, or personal interest 1 ^alleged must be of a substantial nature and based on more than conclusory allegations. Couvillion v. Couvillion, 00-143 (La.App. 5 Cir. 9/26/00), 769 So.2d 747, 753, unit denied, 00-3185 (La. 1/12/01), 781 So.2d 562, citing Tamporello v. State Farm Mut. Auto. Ins. Co., 95-458 (La.App. 5 Cir. 11/15/95), 665 So.2d 503, 506 (citations omitted); see also K.P.W. v. M.P., 07-904 (La.App. 3 Cir. 12/5/07), 2007 WL 4248592, unit denied, 08-0122 (La.2/1/08), 976 So.2d 726, and writ not considered, 08-122 (La.3/24/08), 977 So.2d 944.
C. In any cause in which the state, or a political subdivision thereof, or a religious body or corporation is interested, the fact that the judge is a citizen of the state or a resident of the political subdivision, or pays taxes thereto, or is a member of the religious body or corporation, is not a ground for recusation.
The Louisiana Supreme Court has advised that the recusation of judges is a serious and important legal procedure. In each possible recusal situation, there is a countervailing consideration that militates in favor of a judge not recusing herself, or being recused; that is, that the judge has an obligation, part of her sworn duty as a judge, to hear and decide cases properly brought before her. In re Lemoine, 96-2116 (La.1/14/97), 686 So.2d 837, 839-40.'
W.T. argues that, although a party’s counsel’s representation of a trial judge’s sibling may not statutorily require recusal under La. C.C.P. art. 151, the failure of opposing counsel and Judge Kovach to disclose counsel’s representation or relationship with Judge Kovach’s brother demonstrates an appearance of impropriety that has tainted the proceedings. First, the “ ‘statutory grounds for recusal in civil cases have not been amended by the Legislature’ to include ‘appearance of impropriety’ as a grounds for recusal.... Absent such an amendment or a contrary interpretation by the Supreme Court, ‘a mere appearance of impropriety, not statutorily listed in La. C.C.P. art. 151, cannot be a basis for recusal.’ ” Guidry v. First Nat. Bank of Commerce, 755 So.2d 1033, 1037, citing Pierce v. Charity Hospital, 550 So.2d 211, 214-15 (La.App. 4th Cir.1989), writ denied, 551 So.2d 1341 (La.1989). See also Couvillon v. Couvillon, 00-143 (La.App. 5 Cir. 9/26/00), 769 So.2d 747, 753 (in which this Court found that a trial | mjudge having previously represented a party’s family member does not itself create “any presumption of prejudice” and that the party seeking to recuse the trial judge must still prove actual bias “to such an extent that he would be unable to conduct fair and impartial proceedings”). Second, the Code of Professional Conduct does not require that a counsel disclose to the judge and opposing counsel that she represents the sitting judge’s adult sibling. There is no statutory or professional requirement mandating that she do so.[28]
*352 In his reasons for judgment, the trial judge cites to the Code of Judicial Conduct, Cannon 3(C), which provides, “[a] judge should disqualify himself or herself in a proceeding in which the judge’s impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule. In all other instances, a judge should not recuse himself or herself.” The Code of Judicial Conduct does not require that a trial judge recuse herself to avoid the appearance of impropriety but states that she should recuse herself if her impartiality might reasonably be questioned. This recusal under Cannon 3(C) is voluntary, not mandatory. Radcliffe 10, L.L.C. v. Zip Tube Sys. of Louisiana, Inc., 07-1801 (La.App. 1 Cir. 8/29/08), 998 So.2d 107, 115, writ denied, 09-0011 (La.3/13/09), 5 RnSo.3d 119, and unit denied, 09-0024 (La.3/13/09), 5 So.3d 120, and amended on reh’g, 07-1801 (La.App. 1 Cir. 12/3/08), 22 So.3d 178.
In this case, no evidence was presented to show that Judge Kovach knew or should have known that Bernadette Lee represented her adult sibling in a pending domestic matter on the date that the September 4, 2009 consent judgment was executed or at the time of either recusal hearing.[29] Furthermore, even if one assumes that Judge Kovach was aware of Bernadette Lee’s ongoing professional relationship with her brother, there was no evidence presented that her relationship with either her brother or Bernadette Lee was such that it would in any way affect her ability to be fair and impartial. Therefore, there is no reasonable basis to find that Judge Kovach should have.recused herself at that time. However, even if W.T. presented evidence at the prior recusal hearings that Bernadette Lee represented Judge Kovach’s adult sibling in a domestic matter, that reason alone is not sufficient grounds for recusal.
Even if reason for recusal exists in this case, reason for recusal does not in and of itself create reason to nullify a consent judgment negotiated and entered into between the parties before the sitting judge. See Guidry v. First Bank, 755 So.2d at 1036 (wherein the appellate court affirmed the trial court’s conclusion that “although a violation of the Judicial Code would justify disciplinary action by the Supreme Court, there was nothing in the law suggesting that a judge’s failure to *353 recuse would be grounds to nullify a judgment”) and Viator v. Miller, 04-1199 (La.App. 3 Cir. 4/27/05), 900 So.2d 1135, 1139 (wherein, in dicta, the appellate court states that a judge’s unprofessional behavior does “not create an independent basis for nullity of the judgment ...”); and Barlow v. Barlow, 11-1286 (La.App. 3 Cir. 4/11/12), 87 So.3d 386, 393 (in which the ¶ appellate court determined that Li subsequent recusal of a trial judge did not require nullification of a consent judgment executed between the parties and approved by the trial judge). Moreover, even if W.T. proved actual bias — and, as previously discussed, such a finding is not supported by the record in this case — he would still have to prove that enforcement of the consent judgment at issue deprived him of a legal right and further that enforcement of the judgment would be inequitable and unconscionable. See Kem Search, 434 So.2d at 1070.
A consent judgment is a transaction or compromise between parties who prevent or put an end to a lawsuit by adjusting their differences by mutual consent, balancing the hope of gain against the fear of loss. Millet v. Millet, 04-406 (La.App. 5 Cir. 10/26/04), 888 So.2d 291, 293. A compromise agreement which forms the basis for a consent judgment gets its binding force and effect from the consent of the parties. Sutherlin v. Sutherlin, 05-535 (La.App. 5 Cir. 2/3/06), 930 So.2d 51, 53. Public policy favors these compromise agreements and the finality of the settlements. Id. The consent judgment at issue was signed by both parties’ counsel and entered into between the parties after Dr. York’s extensive testimony that was clearly unfavorable to W.T. Although Judge Kovach approved the consent judgment at issue, she did not rule on any issue before the court but merely accepted the stipulations reached between the parties. Further, the record reflects that Judge Kovach did not sign the written consent judgment; rather, the consent judgment at 'issue was later signed by Domestic Commission Ruben Bailey.
The petitioner in an action for nullity must first prove that the challenged judgment was obtained by fraud or ill practice. Thereafter, the petitioner must prove that the circumstances under which the judgment was rendered shows a deprivation of the litigant’s legal rights and that the enforcement of the judgment would be unconscionable and inequitable. Under the facts of this case, we find | ^that W.T. has failed to meet his burden to prove that the consent judgment at issue was obtained through any fraud or ill practice. The only testimony in the record regarding either the nature of the negotiations or the judge’s behavior in conference on September 4, 2009, was that neither party nor the trial judge exhibited undue influence upon either W.T. or his counsel, Mr. Garrity.[30] W.T. has failed to prove any actual bias against him — rather, the record reflects that Judge Kovach maintained extreme patience and balanced control in the face of a difficult case. Additionally, W.T. failed to prove-that he was deprived of any legal right or that enforcement of the consent judgment at issue — granting him joint custody of his children, allowing him additional time to pay past due child support, and allowing for reconciliation therapy to reunify him with his children — would be unconscionable or inequitable. Accordingly, we find the trial judge erred in granting W.T.’s petition to annul the September 4, 2009 consent judgment.

*354
CONCLUSION

For the reasons provided above, the trial court judgment is hereby reversed and this matter remanded to the trial court for further proceedings.

REVERSED; REMANDED.

. In accordance with Rule 5-2 of the Uniform Rules — Courts of Appeal, we will refer to the parties by their initials to ensure the confidentiality of the minors involved in this proceeding.

. The parties stipulated to Dr. York's expertise in child psychology and custody evaluations.

. The hearing officer’s findings of fact are as follows:
(1) W.T. has not exercised visitation since October 22, 2008.
(2) W.T. did not complete sessions with Dr. York as ordered.
(3) The hearing officer conference began at 10:00 a.m.; at 10:25 a.m., W.T. "angrily left and did not return." W.T.’s counsel remained.
(4) W.T.’s behavior (while present) was "very belligerent” toward all present, including the hearing officer.
(5) Neither W.T. nor his counsel provided any income documentation prior to the conference.
(6) W.T. is self-employed.
(7) The minor children attend [ ] school.
(8) E.A. has seen Dr. York on three occasions.

.As his basis for a change in custody, W.T. asserted that E.A. allowed the minor children to interact with W.T.’s second wife, E.C., from whom he was separated at that time. W.T. further alleged that E.C. was not a good influence on the children because she was pregnant out of wedlock.

. On January 26, 2009, Dr. York provided written correspondence indicating that the children refused to go through an evaluation with their father, W.T., present. The correspondence indicated that the children’s psychotherapist planned to work with the children on this issue so that the evaluation could be completed.

. On that same date, the hearing officer recommended that W.T. exercise weekend visitation beginning February 6, 2009, with W.T. to pick up the children from school on that day. The hearing officer further recommended that the children not be allowed to interact with E.C. until Dr. York completed his custody evaluation.

. La. R.S. 13:4611, in pertinent part, provides:
Except as otherwise provided for by law:
(1) The supreme court, the courts of appeal, the district courts, family courts, juvenile courts and the city courts may punish a person adjudged guilty of a contempt of court therein, as follows:
(d) For any other contempt of court, including disobeying an order for the payment of child support or spousal support or an order for the right of custody or visitation, by a fine of not more than five hundred dollars, or imprisonment for not more than three months, or both.

. W.T. asserts that the trial court ordered both parties to appear on March 9, 2009. However, the trial court judgment orders only W.T. to appear to show proof that he paid his past due child support as ordered.

. W.T.’s counsel informed the Court that she spoke with her client on Friday and that he indicated he would be in Court for the hearing on Monday. W.T.’s counsel further testified that she had not heard from W.T. over the weekend or the morning of the scheduled hearing.

. According to W.T., he did not arrive at Court on March 10, 2009, prepared to make the payment ordered and did so only later in the day when the funds were loaned to him,by his father.

. Scheduled for hearing on September 4, 2009, was E.A.’s previously filed motion to terminate W.T.'s visitation, W.T.’s motion for sole custody and child support, and various rules for contempt filed by the parties.

. Dr. York testified that the son reported that this punishment resulted when the son cried after W.T. restrained him with W.T.'s arms around his neck.

.The record reflects that E.C.’s son was the parties’ children’s former stepbrother with whom they developed a friendship during W.T.’s marriage to E.C.

. The consent judgment further dismissed W.T.'s various rules for contempt against E.A. except for those related to "money issues" which were preserved but continued without date.

. The record reflects that W.T. repeatedly refused to either attend therapy sessions or pay for the therapy sessions with the children. Eventually, following W.T.’s outburst in Dr. Thompson's office — wherein W.T., prior to storming out of the office, yelled at Dr. Thompson to “get a lawyer” — Dr. Thompson informed the court that he could no longer provide reconciliation therapy to this family because W.T. did not trust him and repeatedly would not allow Dr. Thompson to control the reconciliation efforts. On February 9, 2011, the consent judgment at issue was modified to provide that Dr. William Janzen would re *345 place Dr. Thompson as the family therapist and custody facilitator.

. The matter was transferred to Division "L" of the 24th Judicial District Court, the Honorable Donald Rowan presiding.

. Contrary to the assertions in E.A.'s appellate brief, this Court did exercise its supervisory jurisdiction to consider her prior writ application to this Court. This Court found, "[ajfter review, we do not find the trial court erred in overruling the exception of no cause of action. Accordingly, this writ is denied.” E.A. has again assigned as error the trial court’s denial of her exception of no cause of action to W.T.’s Petition to Annul Consent Judgment. This Court has previously considered this issue and found it to be without merit. Upon consideration of the same issue on appeal, we find the Petition to Annul Consent Judgment, which alleges actual bias of the trial judge against W.T. resulting in a judgment obtained by fraud or ill practices, sufficiently states a cause of action and, therefore, E.A.’s argument on this issue is without merit.

. The record reflects that William Shirer had a pending custody matter in Colorado in which Ms. Lee first wrote correspondence to the court regarding a jurisdictional issue and later, in 2010, represented Mr. Shirer pro hac vice. W.T. bases his allegations of bias on Ms. Lee’s representation of Mr. Shirer in the Colorado matter at the time of the September 2009 consent judgment. The Louisiana Attorney Disciplinary Board (the Board), in September of 2012, affirmed the Hearing Committee’s finding of fact that Ms. Lee did not actually represent Mr. Shirer in the Colorado matter until she applied to represent him pro hac vice on appeal. Mr. Shirer testified that the appeal process in the Colorado matter took place in 2010, which is subsequent to the execution of the September 2009 consent judgment. Regarding Mr. Shirer's Colorado matter prior to the appeal process, the Board found that Ms. Lee did not seek any relief in the Colorado district court and, thus, did not engage in the unauthorized practice of law. Rather, the Board found that Ms. Lee was in fact required to communicate with the Colorado court regarding the jurisdictional issue to comply with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA).

.Mr. Shirer testified that when his sister, Judge Kovach, became a judge, she explained to him that she could no longer discuss his case. He testified that he understood that and had no further conversations with his sister on the subject.

.W.T. testified that, on the date that the parties executed the consent judgment, his counsel approached him during a recess and said, "the Court is not going to look favorable if you don’t sign this agreement.” On cross-examination, W.T. also testified that his counsel, Robert Garrity, had just enrolled as counsel of record on that date and, therefore, was not present for any prior hearings with Judge Kovach.

. Ms. Lee testified that all charges were dismissed. The five-page Board report, dismissing all charges against Ms. Lee, was introduced into the record.

. The record reflects that Dr. Thompson has 'a Ph.D in education and is not a medical doctor.

. Ms. Lee testified that she did not charge Mr. Shirer for her legal advice or services performed in connection with the Colorado matter but that Mr. Shirer did pay the Colorado court the $200.00 fee to have Ms. Lee appointed pro hac vice. Mr. Shirer, however, did pay for legal services performed for his domestic case in Louisiana.

. The record reflects that W.T. has consistently refused to timely pay his support obligations. See Treme v. Adams, 10-554 (La. App. 5 Cir. 1/11/11), 59 So.3d 1278, 1282 (in which this Court discusses that E.A. must continuously litigate to force W.T. to comply with his court-ordered support obligations. This Court further found that Judge Kovach abused her discretion in awarding E.A. an insufficient amount of attorney fees after finding W.T. in contempt for his consistent failure to pay child support as ordered and amended the contempt judgment to increase the amount of attorney fees awarded to E.A.). However, even though W.T. has been found in contempt multiple times for failure to pay child support, the record reflects that W.T.— while ordered to pay E.A.’s attorney fees and costs — was not sanctioned (fined or sentenced to imprisonment) following each contempt rule. In addition to the February 20, 2009 hearing discussed above (wherein Judge Ko-vach determined W.T. to be in contempt for failure to pay child support but allowed him additional time to comply prior to imposing sanctions), the record reflects additional instances wherein the trial judge gave W.T. additional time to pay, even after a finding of contempt.' For example, on September 22, 2010, Judge Kovach found W.T. in contempt for failure to pay the children’s medical expenses as ordered. Although the trial judge awarded E.A. attorney fees and costs, the trial judge provided W.T. a purge date and did not impose sanctions until after W.T. again failed to pay on the purge date provided by the trial court.

. The record reflects that E.A. was pregnant with twins at the time of the hearing officer conference at issue.

. The surveillance video was not admitted into evidence and was not proffered by W.T.'s counsel.

. La. C.C.P. art. 151 provides:
A. A judge of any court, trial or appellate, shall be recused when he:
(1) Is a witness in the cause;
(2) Has been employed or consulted as an attorney in the cause or has previously been associated with an attorney during the latter's employment in the cause, and the judge participated in representation in the cause;
(3) Is the spouse of a party, or of an attorney employed in the cause or the judge’s parent, child, or immediate family member is a party or attorney employed in the cause; or
(4) Is biased, prejudiced, or interested in the cause or its outcome .or biased or prejudiced toward or against the parties or the parties' attorneys or any witness to such an
extent that he would be unable to conduct fair and impartial proceedings.
B. A judge of any court, trial or appellate, may be recused when he:
(1) Has been associated with an attorney during the latter's employment in the cause;
(2) At the time of the hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney’s firm), and in this case the employment shall be disclosed to each party in the cause;
(3) Has performed a judicial act in the cause in another court; or
(4) Is related to: a party or the spouse of a party, within the fourth degree; an attorney employed in the cause or the spouse of the attorney, within the second degree; or if the judge’s spouse, parent, child, or immediate family member living in the judge's household has a substantial economic interest in the subject matter in controversy sufficient to prevent the judge from- conducting fair and impartial proceedings in the cause.

. Rule 3.3 of the Rules of Professional Conduct does not apply under the specific facts of this case. Rule 3.3 provides:
(a) A lawyer shall not knowingly:
, (1) make a false statement of fact or law to a tribunal or fail to correct a false statement *352 of material fact or law previously made to the tribunal by the lawyer;
(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable . remedial measures including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.
(b)A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.
(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.
(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

. On the contrary, Mr. Shirer testified that his sister, Judge Kovach, informed him that she could no longer discuss his case.

. As previously discussed, Ms. Lee testified that Judge Kovach remained mostly silent during the conference with the parties in her chambers, allowing counsel to negotiate the settlement.